# EXHIBIT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

```
ERIC HAYDE, individually and )
on behalf of all others      )
similarly situated,          )
                             )
                  Plaintiff, )
                             ) Case No. 8:24-cv-02657-JDE
      vs.                    )
                             )
ARCADIA CONSUMER HEALTHCARE  )
INC., a Delaware corporation,)
                             )
                  Defendant. )
_____________________________)
```

VIDEOTAPED DEPOSITION OF

ERIC HAYDE

TUESDAY, JANUARY 27, 2026, 9:06 A.M.

LOS ANGELES, CALIFORNIA

STENOGRAPHICALLY REPORTED BY:

CHERYL HAAB SCOTT, RDR, CRR, CCRR
CA CSR No. 13600
WA CCR No. 3499
NV CCR No. 1003

JOB NO.: 123987

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

ERIC HAYDE, individually and on behalf of all others similarly situated,

Plaintiff,

vs.

ARCADIA CONSUMER HEALTHCARE INC., a Delaware corporation,

Defendant.

Case No. 8:24-cv-02657-JDE

VIDEOTAPED DEPOSITION OF ERIC HAYDE, taken at 350 South Grand Avenue, Los Angeles, California, on Tuesday, January 27, 2026, at 9:06 a.m., before Cheryl Haab Scott, RDR, CRR, CCRR, Certified Shorthand Reporter No. 13600 in and for the State of California, Certified Court Reporter No. 3499 in and for the State of Washington, and Certified Court Reporter No. 1003 in and for the State of Nevada.

A P P E A R A N C E S
--oOo--

For Plaintiffs:

WILSHIRE LAW FIRM, PLC
BY: THIAGO M. COELHO, ESQ.
9701 Wilshire Boulevard, 12th Floor
Los Angeles, California 90212
213.381.9988
thiago.coelho@wilshirelawfirm.com

For Defendants:

DAVIS WRIGHT TREMAINE LLP
BY: JACOB M. HARPER, ESQ.
PETER K. BAE, ESQ.
350 South Grand Avenue, 27th Floor
Los Angeles, California 90071
213.633.6800
jacobharper@dwt.com
peterbae@dwt.com

Also Present:

MARCUS CAMPBELL, VIDEOGRAPHER

I started seeing a podiatrist because the fungus -- the Fungi-Nail product hadn't worked like I would like for it to work; it didn't work at all. So I was seeing a podiatrist and I asked them if there's any -- if -- because I knew that there was a pill --

MR. COELHO: Can we stop -- go off the record for just a second?

MR. HARPER: Let's finish up the answer and then --

MR. COELHO: Sure.

MR. HARPER: -- we'll go off the record. Continue.

THE WITNESS: I knew there was a pill which I later discovered to be called Terbinafine ACL. So my doctor, his name is Dr. Cheng, prescribed me this 90 days ago, it's in 45-day increments and the fungus was so bad and the hard toenails were so hard, it actually took 90 days for it to work because I've had this condition for over 20 years.

I just ran out of the prescription about two weeks ago, I think, roughly that, and I was going to get another month supply, but I had to have blood work done; and when the blood work showed that my liver was being overtaxed and that because that pill -- it was very hard on the liver and it

causes -- it's causing my liver to become a fatty liver.

So the enzymes that are being built in my liver are three times what the normal person would produce, so I'm in the danger zone so he wouldn't prescribe me another -- and the way -- I've looked at the toenails recently, I think it might have killed all the fungus. I just have residual at the tips. Nothing would kill it.

BY MR. HARPER:

Q What do you mean "Nothing would kill it"?

A Nothing. I've used creams. Topical ointments. I've tried the Fungi-Nail product. Nothing except the pill.

Q Is 90 days ago the first time you saw a foot doctor to diagnose the fungus?

A Yes. It's the first time I decided to see a foot doctor.

MR. COELHO: Can we go off the record real quick?

MR. HARPER: Sure.

THE VIDEOGRAPHER: Off the record at 11:21 a.m.

(Recess.)

THE VIDEOGRAPHER: All right. Back on

**earlier; but I hadn't asked him for treatment of the fungal -- toenail fungus. I was going to see him for some corns and bunions on the foot.**

Q I see.

**A I wasn't really -- I didn't even think about the fact that I could be prescribed the pill. I wasn't even -- I probably should have asked him earlier. I just didn't think about asking him for treating the fungus.**

Q What other treatments have you used or attempted to use since 1998 to treat your toe/foot fungus issues?

**A Whatever's out there. Tinactin, all kinds of foot fungus stuff from the store. You know, none of that stuff works.**

Q Maybe we'll focus on the time after you left incarceration in 2023?

**A You can't buy that stuff. You have to get it prescribed in prison.**

Q Okay. Fair enough.

So let's, for now, let's just focus on after you got out of prison in 2023, what did you do to resolve your foot fungus issue?

**A I started with buying the Fungi-Nail product right away because I saw a commercial once, one**

**commercial, I think, that -- about Fungi-Nail and that it would kill toenail fungus or killed fungus, and I bought it and it didn't work, and I used it for months.**

Q Okay. Was it foot fungus or nail fungus that the commercial was referring to?

**A It was just foot fungus, nail fungus. Right. Both. Fungus.**

Q Okay.

**A Both.**

Q Okay. I'm asking a specific question. Was it nail fungus or was it toe fungus or was it foot fungus?

**A It killed fungus.**

Q Okay.

**A All fungus.**

Q What made you believe that it killed all fungus?

**A It shows a toenail and the applicator of the toenail that goes on the toe. It shows the toenail being treated by this product and states that it "kills fungus."**

Q Any other indications that you recall that it kills all fungus?

**A It says that it kills fungus.**

THE WITNESS: I just remember the date.
BY MR. HARPER:
Q Okay.
A I just remember the date.
Q Okay. And which Walmart did you go to, to buy it?
A The one in Garden Grove on Chapman and Gilbert.
Q And in what aisle of the store did you pick up the Fungi-Nail product?
A Where they sell all the fungus products.
Q And what other fungus products are standing on the same shelf?
A I don't -- I don't -- there's a lot of them. There's creams and topical ointments and it's -- I can't even explain it to you. I'd have to show you in the store. I don't -- I don't -- they're just all in the -- they have a case. It's a case, and they're stacked with all different kinds of stuff for fungus and, you know, feet and, you know, it's actually on the bottom shelf. I specifically remember it being on the bottom shelf of this -- it's a -- I don't know. I just remember exactly where it was.
I can't tell you without showing you in the

**store because I can't really explain to you. You've never been in the store so how am I going to really explain to you where I bought the product.**

Q Did you look at the label when you picked up the product?

**A I looked at the front of the box.**

Q Okay. And did you look at the side of the box?

**A I looked at the front of the bottle.**

Q Well, did you take the bottle out of the box when you were in the store?

**A Yeah.**

Q Before you purchased it?

**A Yes.**

Q And what did you see?

**A I saw a toe.**

Q Okay.

**A And then it says it "kills fungus."**

Q And did you see anything else on the label for the -- when you took it out of the box?

MR. COELHO: Objection. Vague.

You can answer.

**THE WITNESS: Just that it kills fungus.**

BY MR. HARPER:

Q Did you read any of the disclosures on the

**went around on the skin. Every single toe. Full application -- because it's a liquid.**
Q Okay. My question was: For how long were you doing that every -- every night?
**A Oh, I did that for at least --**
MR. COELHO: Can we go off the record just for a second as well after he answers.
**THE WITNESS: Three months. Every night for three months.**
MR. HARPER: Let me finish up this line.
Okay. Let's go off the record real quick.
THE VIDEOGRAPHER: Off the record at 11:33 a.m.
(Recess.)
THE VIDEOGRAPHER: Back on the record. 11:34 a.m.
BY MR. HARPER:
Q You said that you had used it every night for three months. Is that -- Fungi-Nail product every night for three months on your --
**A Yes.**
Q -- toes; correct?
**A Yeah.**
Q Okay. And what happened after three months?
**A Nothing. It did nothing.**

Q Did you buy another bottle of Fungi-Nail?
**A I wouldn't waste my money. It didn't do anything.**
Q Other than seeing a commercial and browsing the aisle at Walmart, did anything else compel you or provide a reason for you buying that Fungi-Nail product?
MR. COELHO: Objection. Misstates prior testimony.
You can answer.
**THE WITNESS: Based on what I saw on the bottle and based on the advertisement that it kills fungus, I was led to believe that that product was going to kill the fungus on my toes.**
BY MR. HARPER:
Q Okay.
**A And it didn't.**
Q And you're referring to the toenails; correct?
**A Yes.**
MR. HARPER: I'm going to hand to the reporter what we'll mark as Exhibit 8.
(Defendants' Exhibit 8 was marked.)
BY MR. HARPER:
Q All right, Mr. Hayde. Do you have this

Exhibit 8 in front of you?
A **I do.**
Q What is Exhibit 8?
A **It looks like an advertisement for Fungi-Nail.**
Q Do you recognize it as the front box cover of the Fungi-Nail product?
A **It definitely has similarities. It looks the same.**
Q Are there any differences from the product that you purchased?
A **It looks identical.**
Q Okay.
A **I believe.**
Q All right. Where on here does it say that it kills toenail fungus?
A **You know what, you've got a toenail right here and you've got it "kills fungus." That's all I need to see.**
Q Okay.
A **So the average person like myself is going to be led to believe that it's going to kill all fungus, not just some fungus.**
Q Okay. I'm asking you a very specific question, though. Where on this label does it say

it "kills toenail fungus"?
**A It says it "kills fungus."**
Q Does it say it "kills toenail fungus"?
**A It doesn't have to.**
Q Please answer the question yes or no. Does it say it "kills toenail fungus"?
MR. COELHO: Objection. Asked and answered.
You can answer.
**THE WITNESS: It kills fungus.**
BY MR. HARPER:
Q Answer my question, please.
**A I did. It kills fungus. It doesn't have to.**
Q Doesn't have to what?
**A Doesn't have to. Doesn't have to say it kills toenail fungus. It kills fungus. That's -- the product says it kills fungus. You've got a toenail right here. What more do you need?**
Q Does it say it "kills toenail fungus"?
**A Yes, it does.**
Q Where does it say it "kills toenail fungus" --
**A It says "kills fungus."**
MR. COELHO: Objection.
**THE WITNESS: I'm sorry.**

the back of the bottle -- and when you do look on the back of the bottle, this print, this red box is not here, number one; number two, it's so small, this fine print that you've highlighted is so small that you can't even read it. You need a magnifying glass to see it.

So how is the average person supposed to see that? It's definitely not this -- it's enhanced so the average person can see it. I couldn't read anything on the back of the damn bottle.

Q I'm talking about the box, not the bottle.

A The box, too.

Q Okay. And I'm asking questions about you, not what you think the normal average person would say. Okay?

Do you understand that?

A I understand that.

Q Okay. Did you read this drug facts label when you purchased the product?

A I didn't see it.

Q Okay. Did you read it at any time even after you purchased the product?

A I did not see it.

Q Okay.

A I couldn't read it if I wanted to.

Q Do you understand it to be part of the label of the box on the Fungi-Nail product that you produced --

**A It may or may not. I don't know where -- I don't recognize it.**

Q You didn't see this part of the label when you purchased it --

**A No.**

(Reporter admonition.)

**THE WITNESS: No.**

BY MR. HARPER:

Q Did you ever seek a refund for the Fungi-Nail product when you determined that it wasn't working the way that you say you wanted it to?

**A Because I hadn't -- because there -- because I had thrown -- I had thrown a receipt away when I first purchased the product because I didn't think it was going to -- it wasn't going to amount to anything, I didn't think I was going to need it. You can't get a refund on something you don't have a receipt for. I just had that bottle.**

Q Do you see the bottom of Exhibit 10, there's a black box and in stand-out, white bold print, it says:

would have no reaction. But it's misleading. It says "Fungi-Nail." It says "Kills fungus." No matter how you slice it. And then there's a toenail here which it implies it's going to kill toenail fungus and that's misleading.

Q When you used the Fungi-Nail product, you were using it just for the nail or were you using it for --

A I was using it to kill the fungus.

Q Okay. But where was the fungus that you were trying to use it for?

A I think that's irrelevant. I wanted to kill the fungus.

MR. COELHO: Hold on. You've got to answer his question.

THE WITNESS: Where was the fungus?

MR. COELHO: Listen to his question and answer his question.

THE WITNESS: Go ahead and ask me again.

MR. HARPER: Can you...

(The record was read as follows:

"Question: But where was the fungus that you were trying to use it for?")

THE WITNESS: On and underneath the toenail.

///

**hepatitis C, and the doctor thought it would be harmful to my liver, so they wouldn't prescribe it back then.**

**But over the years, my liver got better which is why the doctor prescribed it. But -- and the answer to your question was, I thought this product would work based on what I saw on the commercial. It appeared that it would cure my problem without having to see the doctor and needing pills, but it didn't -- it didn't work out that way.**

Q Do you remember the approximate time frame when you saw the commercial?

**A I honestly do not.**

Q Okay. Was it a TV commercial?

**A It was.**

Q Okay. Okay. Going back to the photos, exhibit -- the photos that are in Exhibit 11.

**A You said --**

Q The one you're looking at right here, yeah, Exhibit 11. And so I'm looking at the page that says EH00002. This is a picture of the bottle that you purchased; correct?

**A Uh-huh. Yeah.**

Q And you -- I think you said that before you had purchased it in Walmart, you pulled the bottle

Q Okay. So when you're purchasing products having to do with medical issues, do you look at the labeling for, like, drug disclaimers or medical details that typically are on a medical label?

MR. COELHO: Objection. Vague. Incomplete hypothetical.

You can answer.

**THE WITNESS: I don't normally, you know, if -- if it's something new and something I'm not sure about, I might do some research on AI or on the computer and that was -- AI has only been around for a little while now. Advanced AI, anyway. But aside from that, this particular product speaks for itself so I didn't really -- one, I can't read this; and two, I really didn't even look at it. I was just trying to kill the fungus. It's just, it's real straightforward, very simple.**

BY MR. HARPER:

Q You said that you had used the applicator on all of your toes every night for six months; is that right? I'm sorry. Three months?

**A Yeah.**

Q Did you -- where did you determine that that was the way of using the product?

MR. COELHO: Objection. Form.

**money. Now I'm -- I'm doing very well. I'm doing a lot better. But back then, it was just straight cash. I didn't have credit cards. I didn't have none of that so I was doing bad.**

Q Totally understand.

And I do totally -- I very much appreciate that you're here today and that stuff is in the past so...

**A I appreciate that. Thank you.**

**And I apologize about the profanity and the outburst. I just act -- I need to work on that.**

Q No worries.

MR. COELHO: You guys want to hug? Sorry.

**THE WITNESS: That's wrong.**

MR. HARPER: I'm not done yet.

MR. COELHO: Save your regards.

**THE WITNESS: Watch my back, I guess.**

BY MR. HARPER:

Q Will you buy the Fungi-Nail product ever again?

MR. COELHO: Objection. Vague. Incomplete hypothetical.

You can answer.

**THE WITNESS: You know, if they change the way -- if they change the way that this is labeled**

**and fix the way that it works, I might. If they -- if it's not so misleading, I might. I might. I would -- if I knew that it worked, I would -- if I needed it.**

BY MR. HARPER:

Q Okay. And what would you use it for if --

**A If I had fungus, I mean --**

(Simultaneous colloquy.)

**THE WITNESS: I'm sorry. Sorry about that. My bad. Keep doing it.**

BY MR. HARPER:

Q So what would you use it for if they changed the label?

**A I mean, hypothetically, if I had fungus under my toenails. You said if they changed the product; right?**

Q Yeah.

**A It's still going to be treating fungus, that's what you mean; right?**

Q I'm just asking, you said that if they changed the label, you might buy the product and so I'm asking what you would buy the product for if they changed the label?

MR. COELHO: Objection. Misstates prior testimony. He said and the product itself.

**I didn't even pay attention to the directions or the back of the box.**

BY MR. HARPER:

Q Do you know if you were even using the proper -- the product properly when you were using it for those three months?

**A I knew how to apply the product on my toes, yes.**

Q Do you know if you were -- how do you know that you were using the product consistent with the directions?

**A I know this --**

(Reporter clarification.)

**THE WITNESS: I know there's an applicator here, a brush, that goes into some liquid, and that goes on top of your toenails and then you're supposed to cover all the area of your toenails in order for it to work. That means around the toenails and across the surface of the toenails. That's what I presumed. It really isn't rocket science. It's very straightforward.**

BY MR. HARPER:

Q Did you consult with the section of the drug facts called "Uses," any of the information in that box?

medicine?
A Because I don't trust a lot of it.
Q Why don't you trust it?
A Because a lot of it is garbage and doesn't do what it says it's going to do.
Q Would you say that's your operating assumption for most over-the-counter medication, that it's garbage?
MR. COELHO: Objection. Misstates prior testimony. Misleading.
You can answer.
THE WITNESS: The majority of the stuff over the counter is -- there's a lot of stuff over the counter, not majority of it, but there's a good portion of it that's not even worthy of being compared to something that's -- that treats a medical condition.
BY MR. HARPER:
Q Okay. And how do you determine whether something is garbage or not garbage in terms of over-the-counter medication?
A You know someone that uses it or you use it yourself.
Q Do you look at the label when you're considering whether to use an over-the-counter

medicine?
MR. COELHO: Objection. Vague. Incomplete hypothetical.
You can answer.
**THE WITNESS: No.**
BY MR. HARPER:
Q Why not?
MR. COELHO: Objection. Vague. Incomplete hypothetical.
You can answer.
**THE WITNESS: I just don't.**
BY MR. HARPER:
Q Are the labels confusing?
MR. COELHO: Objection. Vague as to which label.
You can answer.
**THE WITNESS: Boy, you're -- are you talking about this label or any label?**
BY MR. HARPER:
Q I'm talking about the drug facts statements on labels.
MR. COELHO: Objection. Vague as to which label. Incomplete hypothetical. Calls for speculation.
You can answer.

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter and Deposition Notary Public of the States of California, Washington and Nevada does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the deposition were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of the proceedings thereof.

I further certify that I am neither counsel for nor related to any party to said action, nor in any way interested in the outcome thereof.

Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript was requested/offered on the record.

In witness whereof, I have subscribed my name, this date: January 30, 2026

Cheryl Haab Scott, RDR, CRR, CCRR
CSR No. 13600/WA CSR No. 3499/NV CCR No. 1003